UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VIVIAN A. HILL,

                Plaintiff,

          -against-

140 CLAREMONT OWNERS LTD.; TOTAL
MANAGEMENT NYC; MOISES FARHAT
MANAGEMENT CO.; SMITH BUSS &
JACOBS LLP,

                Defendants.

1:25-CV-2025 (LLS)

ORDER OF DISMISSAL
WITH LEAVE TO REPLEAD

LOUIS L. STANTON, United States District Judge:

Plaintiff Vivian A. Hill, of New York, New York, brings this action *pro se*, asserting

claims of race and age based housing discrimination under the Fair Housing Act ("FHA"), Title

VII of the Civil Rights Act, and the New York State and City Human Rights Laws ("NYSHRL"

and "NYCHRL").[1] Plaintiff sues: (1) 140 Claremont Owners Ltd. ("the Coop Board"), which

appears to be the cooperative entity that owns the apartment building in which Plaintiff resides,

at 140 Claremont Avenue, New York, New York ("the building"); (2) Total Management NYC,

("TM"), a building management business currently hired by the Coop Board to manage the

building; (3) Moises Farhat Management Co. ("MFMC"), a building management business that

was formerly hired by the Coop Board to manage the building, but is no longer managing the

---

[1] By order dated January 23, 2026, the court dismissed without prejudice the claims of then-Plaintiff Harold H. Warren due to Warren's and Plaintiff Vivian A. Hill's failure to pay the fees to bring this action and Warren's failure to file an *in forma pauperis* application. (ECF 9) In that same order, the court denied what was then understood to be an application for the court to request *pro bono* counsel brought solely by Hill without prejudice to her filing another such application at a later stage of the litigation. (*Id.*) Because Hill is the only remaining plaintiff in this action, for the purposes of this order, the Court will refer to her as the sole plaintiff in this action and, therefore, as "Plaintiff" in this order.

building; and (4) Smith Buss & Jacobs LLP ("SBJ"), a law firm that represents the Coop Board. Plaintiff seeks attorney's fees, injunctive relief, and damages. She and former-Plaintiff Warren filed, with the complaint, an application for an order to show cause and a temporary restraining order ("OTSC") seeking an order from the court enjoining the defendants: (1) from "contacting [Plaintiff and Warren] in any way to intimidate or cause difficulty to [them]"; (2) from "disturbing . . . Plaintiff[] [and Warren's] bathroom['s] marble floor without replacing [it] within 48 hours"; (3) to "unclog the drainage of [Plaintiff and Warren's] bathtub"; and (4) to "[r]epair/replace [Plaintiff and Warren's] bathroom steam heater by [hiring] a []steam heating and boiler repair specialist." (ECF 4.)

By order dated January 28, 2026, the court granted Plaintiff leave to proceed *in forma pauperis* ("IFP"), that is, leave to proceed without prepayment of fees.

The Court construes Plaintiff's complaint as asserting claims of race-based housing discrimination, as well as claims of retaliation, under the FHA, as well as comparable claims under the NYSHRL and the NYCHRL, and other claims under state law. For the reasons set forth in this order, the Court dismisses this action but grants Plaintiff 30 days' leave to replead her claims in an amended complaint, as specified below.

### STANDARD OF REVIEW

The Court must dismiss an IFP complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss a complaint when the court lacks subject matter jurisdiction over the claims raised. *See* Fed. R. Civ. P. 12(h)(3).

2

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted). But the "special solicitude" in *pro se* cases, *id*. at 475 (citation omitted), has its limits—to state a claim, *pro se* pleadings still must comply with Rule 8 of the Federal Rules of Civil Procedure ("Rule 8"), which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief.

Rule 8 requires a complaint to include enough facts to state a claim for relief "that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads enough factual detail to allow the Court to draw the inference that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing the complaint, the Court must accept all well-pleaded factual allegations as true. *Id*. But it does not have to accept as true "[t]hreadbare recitals of the elements of a cause of action," which are essentially just legal conclusions. *Id*. (citing *Twombly*, 550 U.S. at 555). After separating legal conclusions from well-pleaded factual allegations, the Court must determine whether those facts make it plausible—not merely possible—that the pleader is entitled to relief. *Id*. at 679.

**BACKGROUND**

The following allegations are drawn from the complaint.[2] Plaintiff is African American. Approximately 30 years ago, Plaintiff purchased her apartment, where she had resided

---

[2] The Court quotes from the complaint verbatim. All spelling, grammar, and punctuation are as in the original unless noted otherwise.

previously, when ownership of the building was conveyed to a cooperative entity; she made her husband, Harrold Warren, the apartment's co-owner, thus, making both her and Warren building cooperative shareholders. Plaintiff states that, for the past 15 years, "there . . . [has been] a dramatic increase in racial discrimination against . . . [her] by [the Coop Board] and [TM and MFMC] as new residents [have] moved into the building." (ECF 1, at 7.) She asserts that she and Warren were "denied their rights" "as coop owners." (*Id.*) Specifically, they "were not consulted and offered a vote on who was allowed to reside in the building or [with regard to] functions of either [TM or MFMC] or the coop board." (*Id.*) She states that they "were involuntarily disenfranchised." (*Id.*) Plaintiff and Warren "were denied [their] request for [Coop Board] records, [an] accounting of who the board consist[s] of, its actions, and why they are unresponsive to [Plaintiff and Warren's] repair needs over several years." (*Id.* at 8.) Defendants have violated the Coop Board's bylaws; "[t]hey are engaged in a hostile takeover by anonymous parties, possibly a cabal of new residents alleging to be [the Coop Board] (hiring [TM] and firing [MFMC]).[3] (*Id.* at 9.)

In the Fall of 2024, TM "demande[d] [Plaintiff and Warren's] maintenance money with no [Coop Board] access or explanation given." (*Id.*) On December 27, 2024, Plaintiff and Warren sent a certified letter or letters to TM and MFMC "seeking documents about who [TM and MFMC] are and why they breached the contract by not involving the . . . owners with matters of the [building]." (*Id.*) TM and MFMC, however, have "refuse[d] to provide documents." (*Id.*) Plaintiff asserts that, in response to her and Warren's certified letter(s), Defendants retaliated against them by hiring SBJ "to threaten and intimidate [them] with a

---

[3] Plaintiff does not specify when MFMC ceased managing the building and when TM began doing so.

4

lawsuit." (*Id.*) A February 10, 2025 letter to them from SBJ, written "allegedly on behalf of [the Coop Board, contained] . . . blatant lies that [Plaintiff and Warren had] missed an appointment on December 12, 2024, for repair of a leak (that has been there for over a year, and they were negligent to fix)." (*Id.*) The letter falsely stated that Defendants were to be allowed unobstructed access to Plaintiff and Warren's apartment, but such access "pertain[s] to an emergency, not [to] a yearly ongoing matter. [The Coop Board's] bylaws state just the opposite." (*Id.* at 10.)

Plaintiff alleges that, on December 12, 2024, a TM plumber arrived two hours earlier than scheduled, "unaccompanied by the superintendent. He showed no identification and demanded that . . . [Plaintiff] let him into her apartment." (*Id.*) Plaintiff regards the plumber's early appearance in this manner as having "broke the appointment." (*Id.*) Plaintiff still gave the plumber access to her and Warren's apartment. But the plumber "could not fix the non-functioning steam heater below [the] bedroom apartment window. The[] plumber stated the problem was a boiler in the building that needed repair." (*Id.*) The Coop Board, however, never responded to Plaintiff and Warren's complaints about the steam heater, "leaving [them] to deal with a management company that disregards the need for a prewar steam boiler replacement specialist, not a plumber." (*Id.*) Plaintiff asserts that "[t]he problem has always been [that] the Defendants [have] not want[ed] to pay for the replacement parts to maintain the steam they are required to provide." (*Id.*) The TM-sent plumber, however, wanted "to tear up the floor in the bathroom." (*Id.*) Plaintiff then called "the managing agent, who instructed the plumber to return at the designated time." (*Id.*) But the plumber never returned. TM assured Plaintiff that it would hire another plumber. Plaintiff then received a text message from TM informing her that another plumber "was being sent for another job in the building [the] . . . following morning," December

5

13, 2024, but no appointment was made for the second plumber to go to Plaintiff's apartment. (*Id*. at 11.)

Plaintiff and Warren "have been forced for years to live in essentially slum apartment conditions, unlike other owners." (*Id*. at 15.) They asked for a TM representative to visit their apartment on December 12, 2024, to see the problems in their apartment; this was the same date when a plumber visited their apartment. A TM representative initially made an appointment to visit at 2:00 p.m. that day, "[h]owever, after discovering [that Plaintiff and Warren] are Afro-American, he canceled. He refused to meet with [them] at any future time when asked." (*Id*.)

TM "want[s] to tear up the marble floor alongside [Plaintiff's] bathtub[] [to] look[] for a leak." (*Id*. at 10.) TM has alleged that Plaintiff has "prevented" it from repairing that leak. There is no evidence, however, of a leak dripping from Plaintiff and Warren's apartment into the basement of the building (Plaintiff and Warren reside in a ground floor apartment). Plaintiff contends that TM "should instead understand that [MFMC] failed to correct the issue of the bathtub clog and [that] the leak coming from the same water pipes [is the] problem. Both issues are the same." (*Id*.) The February 10, 2025 letter from SBJ "proves [that the defendants] have no intention of addressing their responsibility . . . but just what concerns them." (*Id*.)

"The Defendants [have] refuse[d] to guarantee [that] they would replace the marble floor in the bathroom in the same condition as before, intending to tear it up and find a suspected chronic water leak [that has existed for] over a year." (*Id*. at 11.) Plaintiff states that "[t]he [d]efendants have singled out . . . Plaintiff[] to live . . . in slum landlord-like conditions and [to be] second class to the building's other . . . owners." (*Id*.)

Plaintiff also asserts that the radiator in her and Warren's bedroom does not work. She and Warren have called 311 "about 10 times," without success, "to get the Defendants to get a

[]steam heating and boiler repair specialist[] sent to do the repair correctly, not a plumber." (*Id.*) The New York City Department of Housing Preservation and Development ("HPD") directed MFMC to have such a specialist do the repairs, but MFMC only hired a plumber. "Said plumber started work over a year ago on the nonfunctioning steam radiator but abandoned it." (*Id.* at 12.) That plumber said he did not have the expertise to complete the repairs, "which required a unit replacement, and building boiler repairs [that MFMC] needed to pay for." (*Id.*)

In Plaintiff's kitchen, the faucet leaked, and the floor beneath the kitchen sink became damaged because of that leak, which caused a hole in the kitchen floor to form as well as a kitchen cabinet to be damaged; the hole was repaired but the faucet and the cabinet have yet to be repaired. Plaintiff's multiple 311 calls have forced MFMC "to do extensive work in [Plaintiff's] kitchen." (*Id.*)

Plaintiff's bathtub drain is also recurrently clogged, rendering Plaintiff unable to shower. The building's superintendent has failed to repair that, causing Plaintiff to call 311 and causing HPD "to get the Defendants a Roto-Rooter-type man to do the work." (*Id.*) "Currently, [Plaintiff and Warren] are unable to take showers without standing in dirty water that does not drain well." (*Id.*)

In addition, for years, the defendants have not supplied Plaintiff and Warren with a working smoke detector; Plaintiff and Warren had to call 311 to get HPD to install one. When Plaintiff and Warren's toilet clogged, their superintendent attempted to repair it in a manner that damaged it. MFMC has refused Plaintiff and Warren's request for a replacement toilet.

In 2024, a foul odor began to emanate from the apartment next door to Plaintiff and Warren's; it appears that their next-door neighbor died in that apartment. "The police placed a green sticker that said no one could enter." (*Id.*) Plaintiff and Warren requested that MFMC

"contact the police to allow entry [into that apartment to] . . . have the dwelling cleaned," but MFMC did not respond to their request. (*Id.*) When Plaintiff and Warren would complain to the Coop Board, it would always refer their complaints to MFMC.

On one occasion, a neighbor called 911 to report a "verbal discussion [between Plaintiff and Warren that] was dangerous"; as a result, the superintendent broke into their apartment via a window to let the authorities in. Plaintiff and Warren, who were scared by the loud banging on their front door, hid themselves in their bathroom. Once it was explained to the authorities that there was no violence occurring, the authorities left. Later, Plaintiff and Warren's apartment was burglarized via the window that the superintendent had broken through because it was no longer secured. Defendants have refused to pay to secure the window.

On another occasion, "[t]here was an electrical fire [caused by] the light fixture [in Plaintiff and Warren's] bathroom. [But] [t]he superintendent and [MFMC] were adamant [that] there was nothing wrong electrically." (*Id.* at 15.) The superintendent and MFMC refused to hire an electrician to look into the matter. Plaintiff called 311; an "investigator determined [that] it was a fire hazard to have not removed prewar lighting fixtures with electrical outlets . . . [and also that] the electrical wires connected were defective." (*Id.*) This caused Defendants to be "forced to have the violations corrected," but "they refused to have the bathroom restored." (*Id.*)

Plaintiff and Warren "have been forced for years to live in essentially slum apartment conditions, unlike other owners." (*Id.*) She states that she and Warren "are being forced out, similar to other racial cleaning techniques, by parties of discrimination." (*Id.*) Plaintiff asserts that the defendants':

> racist policies of no service and disenfranchisement pe[a]ked into retaliatory
> threats to [Plaintiff and Warren's] certified letter seeking guarantees of [the Coop
> Board's bylaws]. As of March 4, 2025, [Defendants] seek to evict [Plaintiff and

8

Warren] who pay maintenance fees, whereas White shareholders are treated differently upon requesting fair treatment.

(*Id.* at 16.)

In addition to attorney's fees, damages, and her request to have *pro bono* counsel represent her and Warren, Plaintiff seeks, in her complaint, the repairs sought in her OTSC as well as other repairs mentioned above as previously, but unsuccessfully sought.

## DISCUSSION

### A.   Claims under the FHA

The Court construes Plaintiff's complaint as asserting claims of race-based housing discrimination, as well as claims of retaliation, under the FHA. For the reasons discussed below, Plaintiff fails to allege facts sufficient to state either type of these claims.

### 1.   Claims of housing discrimination under the FHA

The FHA "broadly prohibits discrimination in housing." *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 93 (1979). Among other things, it prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, . . . national origin," or disability.[4] 42 U.S.C. § 3604(b), (f)(2). Generally, to state a claim of intentional discrimination under the FHA, a plaintiff must allege facts showing that she is "'a member of a protected class,' suffered relevant 'adverse' treatment, and '. . . [she must] sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation.'" *Palmer v. Fannie Mae*, 755 F. App'x 43, 45 (2d Cir. 2018) (summary order) (quoting *Littlejohn v. City*

---

[4] "[A]ge is not a protected characteristic under the FHA." *Wood v. Mut. Redevelopment Houses, Inc.*, No. 1:14-CV-7535 (AT) (DCF), 2016 WL 11720460, at *12 (S.D.N.Y. Mar. 31, 2016). The NYSHRL and the NYCHRL, however, include age as a protected characteristic with respect to their housing discrimination prohibitions. *See* N.Y. Exec. Law § 296(2-a), (5)(a); N.Y.C. Admin. Code § 8-107(5)(a).

*of New York*, 795 F.3d 297, 311 (2d Cir. 2015) (footnote omitted)); "'[A] plaintiff need only give plausible support to a minimal inference of discriminatory motivation' at the pleading stage." *Id.* at 45-46 (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015)). Thus, "a plaintiff . . . [does] not need to . . . [plead] that her protected status was a but-for cause of the adverse action she suffered, but only a motivating factor." *Id.* at 46 (citing, *inter alia*, *Vega*, 801 F.3d at 86); *see also Saint-Jean v. Emigrant Mortg. Co.*, 129 F.4th 124, 153 (2d Cir. 2025) ("An FHA plaintiff can show . . . intentional discrimination . . . without having to establish that the defendant was motivated by hatred, dislike, or bias."); *MHANY Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 616 (2d Cir. 2016) ("[I]f one of the motivating factors for an act was unlawful, the act violated the FHA.").

A person asserting a claim of discrimination under the FHA cannot, however, state such a claim based on conclusory allegations. *See Palmer*, 755 F. App'x at 46 (holding, in the FHA context, that the plaintiff had "failed to provide facts that could plausibly support even a minimal inference of discriminatory motivation. [Her] complaint merely raises conclusory allegations that Fannie Mae 'discriminated against [her], a pregnant woman,' but fails to offer any facts to support such allegations." (citing *Iqbal*, 556 U.S. at 681)); *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 73 (2d Cir. 2021) ("Although Francis has claimed that he is a member of a protected class, his Complaint lacks even 'minimal support for the proposition' that the KPM Defendants were motivated by discriminatory intent"; noting that the plaintiff's allegations were conclusory (footnote omitted)). Thus, "[w]hile [a] [p]laintiff [may] allege[] reprehensible conduct on [a defendant's] part, [she does not state a claim of discrimination under the FHA if] she alleges no facts which would make it plausible that discrimination because of [the]

10

[p]laintiff's alleged [protected class] motivated [the defendant's] action." *Doe v. YMCA of Ne. N.Y.*, 1:19-CV-0456, 2020 WL 705264, at *7 (N.D.N.Y. Feb. 12, 2020).

A defendant's awareness of a plaintiff's membership in a protected class, without at least some factual support for discriminatory intent, is insufficient to state a claim of discrimination under the FHA. *See Palmer*, 755 F. App'x at 46; *Evans v. Bronxworks, Inc.*, No. 1:24-CV-7507 (LJL), 2025 WL 3469952, at *8 (S.D.N.Y. Dec. 3, 2025) (the plaintiff did not state an FHA claim of discrimination when, "at most, she has alleged that Bronxworks was aware of her [protected] status . . . [and] she has not alleged that Bronxworks treated her differently than others on that basis"); *Avila v. Acacia Network, Inc.*, Nos. 1:23-CV-7834 (PAE), 1:23-CV-10260 (PAE), 2025 WL 2233987, at *5 (S.D.N.Y. Aug. 6, 2025) ("These claims are rightly dismissed because the facts pled do not support the inference that, to the extent the ACACIA defendants were even aware of Avila's disability, they discriminated against him on the basis of it."). Thus, if a person asserting a claim under the FHA shows that she is a member of a protected class, "but [s]he 'has not alleged that [Defendants] treated [her] differently than others *on that basis*,'" then she fails to state a claim of discrimination under the FHA. *Ballentine v. Post Graduate Ctr. for Mental Health*, No. 1:25-CV-0515 (AT) (BCM), 2026 WL 866846, at *3 (S.D.N.Y. Mar. 30, 2026) (citation omitted); *Evans*, 2025 WL 3469952, at *8; *Avila*, 2025 WL 2233987, at *5; *see Francis*, 992 F.3d at 73-74 ("[B]ecause the Complaint does not provide enough information to compare the events of which Francis complains to the KPM Defendants' responses to other violations, there is no factual basis to plausibly infer that the KPM Defendants' conduct with regard to Francis was motivated by racial animus." (footnote omitted)). In addition, with respect to allegations giving rise to a claim of discrimination under the FHA that the defendants "imposed 'harsher terms on [the plaintiff],'" such claims cannot be "conclusory and . . . [must

11

be] supported by . . . [facts] showing that similarly situated residents . . . were treated different from [her]." *Ballentine*, 2026 WL 866846, at *3 (citation omitted).

Plaintiff, who alleges that she is African American, states that she has "been forced for years to live in essentially slum apartment conditions, unlike other owners of the Coop." (ECF 1, at 15.) She further asserts that the defendants "have singled out . . . [her] to live in . . . slum landlord-like conditions . . . [such that she is] second class to the building's . . . owners." (*Id.* at 11.) In this context, she does not, however, allege anything about the other members of the Coop or their experiences with respect to residing within the building to give an inference of race discrimination.

Plaintiff also alleges that, beginning about 15 years ago and continuing to the present, "there [has been] a dramatic increase in racial discrimination against . . . [her] by . . . [the Coop Board] and . . .[by TM and MFMC] as new residents moved into the building." (*Id.* at 7.) She does not state how and under what circumstances this racial discrimination has occurred.

Plaintiff additionally alleges that, on December 12, 2024— the same date that a plumber allegedly visited her apartment to fix a leak, but was unable to do so (*id.* at 10)—she and Warren invited a TM representative to visit the apartment to see its problems (*id.* at 15). She also alleges that, "after discovering [that] Plaintiff[] [and Warren] are Afro-American, he canceled." (*Id.*). Moreover, Plaintiff alleges that the TM representative refused to meet with them in the future. (*Id.*) She does not give any factual support, however, as to how and when the TM representative learned that she and Warren are African American,[5] why and under what circumstances he cancelled the appointment, and why he would not meet with them in the future, such that there

---

[5] Plaintiff alleges that she and Warren have been living in that apartment, in that building, for over 30 years (ECF 1, at 7), and that MFMC managed the building before TM (*id.* at 9).

would be an inference that a motivating factor for that representative's actions was Plaintiff's race.

Plaintiff further alleges that "the [d]efendant[s'] [have] racist policies of no service" and that, "[a]s of March 4, 2025, [Defendants] seek to evict [her and Warren] . . . , whereas White shareholders are treated differently upon requesting fair treatment." (*Id.* at 16.) She also alleges that she and Warren "are being forced out, similar to other racial cleaning techniques." (*Id.*) Plaintiff does not, however, provide any facts supporting the contention that Defendants' alleged policy of providing poor repair service to Plaintiff and Warren, or their alleged efforts to evict Plaintiff and Warren, are based in any way on Plaintiff's race. In addition, Plaintiff alleges nothing suggesting that she has been treated differently by Defendants based on her race, as opposed to white shareholders, with respect to requesting and receiving unspecified "fair treatment."

Thus, Plaintiff's allegations of race discrimination are conclusory; they do not give a minimal inference that, with respect to any of Defendants' alleged adverse actions against Plaintiff, her race was a motivating factor. Accordingly, the Court dismisses Plaintiff's claims of race discrimination under the FHA for failure to state a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii). In light of Plaintiff's *pro se* status, however, the Court grants Plaintiff leave to replead these claims in an amended complaint in which she alleges facts sufficient to state a claim of discrimination under the FHA.

### 2.    Claims of retaliation under the FHA

The FHA also prohibits "coerc[ion], intimidat[ion], threat[s], or interfere[nce] with any person in the exercise or enjoyment of, or on account of [her] having exercised or enjoyed, or on account of [her] having aided or encouraged any other person in the exercise or enjoyment of,

any right granted or protected by" the antidiscrimination provisions of the FHA. 42 U.S.C.

§ 3617. To state a claim of retaliation under the FHA, a plaintiff must allege that she:

> (1) . . . engaged in protected activity by opposing conduct prohibited under the FHA; (2) that defendants were aware of that activity; (3) that defendants subsequently took adverse action against plaintiffs; and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse action.

*Lynn v. Vill. of Pomona*, 373 F. Supp. 2d 418, 432 (S.D.N.Y. 2005), *aff'd*, 212 F. App'x 38 (2d

Cir. 2007) (summary order).

"The term 'protected activity' refers *to action taken to protest or oppose statutorily

prohibited discrimination.*" *Favourite v. 55 Halley Street, Inc.*, 381 F. Supp. 3d 266, 278

(S.D.N.Y. 2019) (Román, D.J.) (internal quotation marks and citation omitted). It "includes the

'[f]iling [of] complaints . . . and even less formal means of protest such as letter writing, . . . if it

is lodged *in protest of statutorily prohibited discrimination.*'" *Evans*, 2025 WL 3469952, at *9

(citation omitted). But letters written and complaints made for other reasons are not protected

activity. *See id.*; *Wilson v. Wilder Balter Partners, Inc.*, No. 7:13-CV-2595 (KMK), 2015 WL

685194, at *13 (S.D.N.Y. Feb. 17, 2015); *Miller v. 270 Empire Realty LLC*, No. 09-CV-2857,

2012 WL 1933798, at *5 n. 9 (E.D.N.Y. Apr. 6, 2012) ("Filing a complaint with HPD that is not

related to unlawful discrimination is not protected activity within the meaning of the FHA or

analogous State and City laws."), *report & recommendation adopted*, 2012 WL 1940829

(E.D.N.Y. May 29, 2012); *cf. United States v. Weisz,* 914 F. Supp. 1050, 1054 (S.D.N.Y.1996)

("[T]o bring a claim within [Section] 3617 [of the FHA], a plaintiff must allege conduct on the

part of a defendant which in some way or other implicates the concerns expressed by Congress in

the FHA. If it were otherwise, the FHA would federalize any dispute involving residences and

people who live in them.") (Haight, D.J.).

14

To the extent that Plaintiff asserts that she has been retaliated against by Defendants because of her complaints about the conditions of her apartment or because of her attempts to correspond with the Coop Board, TM, or MFMC about those conditions and/or her inability to voice her concerns as a voting shareholder, Plaintiff does not allege facts showing that such complaints or communications were protected activity. This is because she has alleged nothing to suggest that any such complaints or correspondences were made to protest or oppose discrimination prohibited by the FHA. Rather, Plaintiff alleges that her complaints and letters to Defendants were only about the conditions of her apartment, the building in general, and, perhaps, her inability to voice her concerns as a voting shareholder. The Court therefore dismisses such claims for failure to state a claim on which relief may be granted. *See* § 1915(e)(2)(B)(ii). The Court, however, grants Plaintiff leave to replead these claims in an amended complaint in which she alleges facts sufficient to state a claim of retaliation under the FHA.

## B.    Warning

This is not the first time that this court has dismissed as non-meritorious—and did so *sua sponte*—a civil action brought by Plaintiff *pro se*. *See Hill Ann v. Wiviott*, No. 1:21-CV-9210 (LTS), 2021 WL 5450155 (S.D.N.Y. Nov. 19, 2021) (granting Plaintiff, who proceeded under the name "Vivian Hill Ann," leave to amend), 2022 WL 709694 (S.D.N.Y. Feb. 22, 2022) (dismissing action for failure to state a claim on which relief may be granted, under Section 1915(e)(2)(B)(ii), due to failure to file an amended complaint), *appeal dismissed*, No. 22-480 (2d Cir. Apr. 12, 2022) (effective May 3, 2022); *Hill v. N.Y.C. Dep't of Health & Mental Hygiene*, No. 1:22-CV-7203 (LTS), 2022 WL 12004853 (S.D.N.Y. Oct. 17, 2022) (granting Plaintiff leave to amend), ECF 1:22-CV-7203, 16 (S.D.N.Y. Aug. 8, 2023) (dismissing action, under Section 1915(e)(2)(B)(i)-(iii), for failure to file an amended complaint); *Hill v. Riverside Chruch.org*,

15

ECF 1:23-CV-0059, 5 (S.D.N.Y. May 9, 2023) (granting Plaintiff leave to amend), ECF 1:23-CV-0059, 6 (S.D.N.Y. July 28, 2023) (dismissing action, under Section 1915(e)(2)(B)(ii), for failure to file an amended complaint); *Hill v. Citibank.com*, ECF 1:23-CV-0316, 4 (S.D.N.Y. Nov. 27, 2023) (dismissing action for lack of subject matter jurisdiction, under Fed. R. Civ. P. 12(h)(3), with leave to amend), ECF 1:23-CV-0316, 5 (S.D.N.Y. Feb. 15, 2024) (civil judgment dismissing action for lack of subject matter jurisdiction, under Fed. R. Civ. P. 12(h)(3), for failure to file an amended complaint).

In light of Plaintiff's abovementioned litigation history in this court, the Court warns Plaintiff that, if she brings any future nonmeritorious civil action in this court, the court may issue an order directing her to show cause why the court should not bar her from filing *any* future civil action in this court IFP unless she receives leave from the court to file. *See* 28 U.S.C. § 1651; *Sledge v. Kooi*, 564 F.3d 105, 109-10 (2d Cir. 2009) (discussing circumstances where frequent a *pro se* litigant may be charged with knowledge of particular legal requirements).

## LEAVE TO AMEND GRANTED

Plaintiff proceeds in this matter without the benefit of an attorney. District courts generally should grant a self-represented plaintiff an opportunity to amend a complaint to cure its defects, unless amendment would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Indeed, the United States Court of Appeals for the Second Circuit has cautioned that district courts "should not dismiss [a *pro se* complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)). Because Plaintiff may be able to allege additional facts to state a valid claim of discrimination

16

and/or retaliation under the FHA, the Court grants Plaintiff 30 days' leave to replead those claims in an amended complaint, as specified above.

If Plaintiff does not file an amended complaint within the time allowed, the Court will direct the Clerk of Court to enter a judgment dismissing this action for the reasons set forth in this order. An additional effect of the entry of the judgment will be the Court's declination of consideration, under its supplemental jurisdiction, of Plaintiff's claims under state law, including those claims brought under the NYSHRL and the NYCHRL. *See* 28 U.S.C. § 1367(c)(3).

## CONCLUSION

The Court dismisses this action for the reasons set forth in this order, which are the reasons why the court denies Plaintiff the immediate injunctive relief she seeks in her OTSC. (*See* ECF 4.) The Court dismisses Plaintiff's claims under the FHA for failure to state a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii). The Court, however, grants Plaintiff leave to replead, in an amended complaint to be filed within 30 days of the date of this order, those claims for which the Court has granted Plaintiff leave to replead, as discussed above.

If Plaintiff does not file an amended complaint within the time allowed, the Court will direct the Clerk of Court to enter a judgment dismissing this action for the reasons set forth in this order. An additional effect of the entry of the judgment will be the Court's declination of consideration, under its supplemental jurisdiction, of Plaintiff's claims under state law, including those claims brought under the NYSHRL and the NYCHRL. *See* 28 U.S.C. § 1367(c)(3).

The Court directs the Clerk of Court to hold this matter open on the docket until a civil judgment is entered.

SO ORDERED.

Dated:    June 10, 2026
          New York, New York

                                        _Louis L. Stanton_
                                        Louis L. Stanton
                                        U.S.D.J.